Order Filed on
**1/24/2008**
by Clerk U.S. Bankruptcy
Court District of New Jersey

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**JOHN T. CARROLL, III (JC4451)**
**JERROLD N. POSLUSNY, JR. (JP7140)**
**COZEN O'CONNOR**
LibertyView, Suite 300
457 Haddonfield Road
Cherry Hill, NJ 08002
(856) 910-5000
(856) 910-5075 (fax)

Attorneys for Debtors

In re:

TRENTON CONVALESCENT CENTER URBAN
RENEWAL ASSOCIATES, L.P. and TRENTON
CONVALESCENT CENTER OPERATING
COMPANY, L.P.,

                              Debtors.

Case No. 07-25874 (GMB)
(Jointly Administered)

Judge:  Gloria M. Burns

Chapter:  11

**ORDER CONFIRMING THE JOINT PLAN OF REORGANIZATION OF TRENTON
CONVALESCENT CENTER URBAN RENEWAL ASSOCIATES, L.P. AND TRENTON
CONVALESCENT CENTER OPERATING COMPANY, L.P.**

The relief set forth on the following pages, numbered two (2) through twenty-four (24), is hereby

**ORDERED**.

**DATED: 1/24/2008**

Honorable Gloria M Burns
United States Bankruptcy Court Judge

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company, L.P.

_____

THIS MATTER having come before the Court on January 22, 2008, the date set for the

Confirmation Hearing for the Joint Plan (the "Plan")[1] of Reorganization of Trenton Convalescent

Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company,

L.P. (collectively, the "Debtors"); and this Court finding that:

A.    Jurisdiction and Venue.  This Court has jurisdiction over these Chapter 11 Cases

and the subject matter of the Confirmation Hearing pursuant to 28 U.S.C. §§ 157 and 1334.  The

Confirmation Hearing is a "core proceeding" pursuant to 28 U.S.C. § 157 (b) (2) and this Court

has jurisdiction to enter a final order with respect thereto.  Venue of these Chapter 11 Cases is

proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    Notice.  A Disclosure Statement was distributed by Debtors prior to the Petition

Date as part of Debtors' Pre-Petition Solicitation.  The Disclosure Statement contains adequate

information as provided by the Bankruptcy Code.  Due notice of the date of the Confirmation

Hearing was sent to all Creditors and parties-in-interest under the circumstances of these Chapter

11 Cases.

C.    Reasonable Classification of Claims (11 U.S.C. § 1122(a)).  The classification of

Claims and Equity Interests in the Plan is reasonable and necessary, and places Claims or Equity

---

[1] Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Plan.  The term "Plan" shall include the Supplement to Disclosure Statement and Joint Plan of Reorganization Plan of Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company, L.P., which was an amendment to the Plan as far as treatment of the C Bonds and was filed with the Court on the Petition Date (Dkt. No. 4).

*Approved by Judge Gloria M. Burns January  24, 2008*

Page 3

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

Interests in a particular class where such Claim or Equity Interest is substantially similar to the

other Claims or Equity Interests of such class, and therefore satisfies the requirements of 11

U.S.C. § 1122(a).

       D.     <u>Designation of Classes (11 U.S.C. § 1123(a)(1))</u>.  The Plan properly designates all

classes of Claims and Equity Interests, and therefore satisfies the requirements of 11 U.S.C.

§ 1123(a)(1).

       E.     <u>Specification of Unimpaired Classes (11 U.S.C. § 1123(a)(2))</u>.  The Plan specifies

the classes of Claims and Equity Interests which are unimpaired or impaired, and therefore

satisfies the requirements of 11 U.S.C. § 1123(a)(2).

       F.     <u>Specification of Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.  The

Plan specifies the treatment of each impaired class, and therefore satisfies the requirements of 11

U.S.C. § 1123(a)(3).

       G.     <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  The Plan provides the same

treatment for each Claim or Equity Interest of a particular class, and therefore satisfies the

requirements of 11 U.S.C. § 1123(a)(4).

       H.     <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>.  The Plan provides adequate

means for its implementation, and therefore satisfies the requirements of 11 U.S.C. § 1123(a)(5).

       I.     <u>Equity Securities (11 U.S.C. § 1123(a)(6))</u>.  Debtors are not corporations,

therefore, 11 U.S.C. § 1123(a)(6) is not applicable in these Chapter 11 Cases.

Page 4

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

 J. <u>Selection of Officers and Directors (11 U.S.C. § 1123(a)(7))</u>.  Debtors' Plan

provides that Debtors' current officers will continue their current positions.  Therefore the Plan is

consistent with the interests of Creditors and Equity Interests and with public policy and

therefore satisfies the requirements of 11 U.S.C. § 1123(a)(7).

 K. <u>Impairment or Unimpairment of Claims or Equity Interests and Modification of</u>

<u>Rights of Secured Claims (11 U.S.C. §§ 1123(b)(1) and (5))</u>.  The Plan impairs or leaves

unimpaired, as the case may be, each class of Claims or Equity Interests, and therefore complies

with 11 U.S.C. §§ 1123(b)(1) and (5).

 L. <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>

<u>(11 U.S.C. § 1123(b)(2))</u>.  The Plan provides for the assumption of all executory contracts or

unexpired leases that have not been previously assumed or rejected by Debtors (or otherwise

treated by the Plan) with the Court's approval on or prior to the Confirmation Date, and therefore

complies with 11 U.S.C. § 1123(b)(2).

 M. <u>Settlement and Compromise (11 U.S.C. § 1123(b)(3))</u>.  The Plan provides for the

settlement or adjustment of certain Claims or Equity Interests belonging to Debtors or their

estates which are fair and equitable and in the best interests of Debtors, their estates and all

holders of Claims and Equity Interests, and therefore Plan complies with 11 U.S.C. § 1123(b)(3).

 N. <u>Compliance With Provisions of the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>.

The Plan complies with all applicable provisions of the Bankruptcy Code including, without

limitation, 11 U.S.C. §§ 1122 and 1123 and, as required pursuant to Bankruptcy Rule 3016(b), is

*Approved by Judge Gloria M. Burns January  24, 2008*

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company, L.P.

_____

dated and identifies Debtors as the proponents of the Plan, and therefore satisfies the

requirements of 11 U.S.C. § 1129(a)(l).

O.    <u>Debtors' Compliance With Provisions of the Bankruptcy Code (11 U.S.C.</u>

<u>§ 1129(a)(2))</u>.  Debtors, as the Plan proponents, have complied with the applicable provisions of

the Bankruptcy Code including, without limitation, 11 U.S.C. §§ 1125 and 1126, and therefore

has satisfied the requirements of 11 U.S.C. § 1129(a)(2).

P.    <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>.  The Plan has been

proposed in good faith, for the valid business purpose of reorganizing Debtors and has not been

proposed by any means forbidden by law, and therefore satisfies the requirements of 11 U.S.C.

§ 1129(a)(3).

Q.    <u>Payment of Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>.  Any payments made or

to be made by Debtors for Administrative Expenses in or in connection with these Chapter 11

Cases, or in connection with the Plan and incident to these Chapter 11 Cases, have been

approved by, or will be subject to the approval of, this Court as reasonable, and therefore

satisfies the requirements of 11 U.S.C. § 1129(a)(4).

R.    <u>Disclosure of Identities of Officers, Directors and Insiders (11 U.S.C.</u>

<u>§ 1129(a)(5))</u>.  The Plan discloses the identity and affiliation of any individual, including

insiders, proposed to serve, after confirmation of the Plan, as a director, officer or trustee of

Debtors and the appointment to, or continuance in such office of each such individual is

Page 6

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

consistent with the interests of Creditors and Equity Security Holders and with public policy, and

therefore satisfies the requirements of 11 U.S.C. § 1129(a)(5).

      S.    <u>No Rate Change (11 U.S.C. § 1129(a)(6))</u>.  11 U.S.C. § 1129(a)(6) is inapplicable

to the Plan since there are no rate changes provided for in the Plan for which a governmental

regulatory commission will have jurisdiction over Debtors after confirmation.

      T.    <u>Best Interests of Creditors (11 U.S.C. § 1129(a)(7))</u>.  With respect to the impaired

classes of Claims (classes 1-4, 6 and 7), such classes have accepted the Plan, or will receive or

retain under the Plan on account of such Claim, property of a value, as of the Effective Date of

the Plan, that is not less than the amount that such holder would so receive or retain if Debtors

were liquidated under Chapter 7 of the Bankruptcy Code on such date.  Therefore, the Plan

satisfies the requirements of 11 U.S.C. § 1129(a)(7).

      U.    <u>Treatment of Administrative Expense Claims, Priority Non-Tax Claims and</u>

<u>Priority Tax Claims (11 U.S.C. § 1129(a)(9))</u>.  The Plan satisfies the requirements of 11 U.S.C.

§ 1129(a)(9) since, except to the extent that the holder of a particular Claim has agreed to a

different treatment of such Claim, the Plan provides that Administrative Expenses pursuant to 11

U.S.C. § 507(a)(l), Priority Non-Tax Claims pursuant to 11 U.S.C. §§ 507(a)(2) through

507(a)(7), and Priority Tax Claims pursuant to 11 U.S.C. § 507(a)(8), shall be treated in

accordance with the applicable provisions of 11 U.S.C. §§ 1129(a)(9)(A), (B) or (C).

      V.    <u>Acceptance By At Least One Impaired Class (11 U.S.C. § 1129(a)(10))</u>.  At least

one class that is impaired under the Plan has accepted the Plan, determined without including any

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

acceptance of the Plan by any insider holding a Claim in such class.  Therefore the Plan satisfies

the requirements of 11 U.S.C. § 1129(a)(10).

W.    Feasibility (11 U.S.C. § 1129(a)(11)).  Based upon the procedures implemented to

resolve their financial problems, and the financial projections included in the Disclosure

Statement, the Plan is not likely to be followed by the need for further financial reorganization of

Debtors.  Accordingly, the Plan satisfies the financial feasibility requirements of 11 U.S.C. §

1129(a)(11).

X.    Payment of Fees (11 U.S.C. § 1129(a)(12)).  Debtors have paid or, pursuant the

Plan, shall pay, on or prior to the Effective Date, all amounts due under 28 U.S.C. § 1930, and

therefore the Plan satisfies the requirements of 11 U.S.C. § 1129(a)(12).

Y.    Retiree Benefits (11 U.S.C. § 1129(a)(13)).  11 U.S.C. § 1129(a)(13) is not

applicable to the Plan because Debtors are not a party to any retiree benefit plan within the

meaning of the Bankruptcy Code.

Z.    Cramdown (11 U.S.C. § 1129(b)).  11 U.S.C. § 1129(b) is not applicable to the

Plan because all classes of Claims have accepted (or are deemed to have accepted) the Plan.

AA.    No Other Plan (11 U.S.C. § 1129(c)).  No other plan of reorganization has been

filed with respect to these Chapter 11 Cases.

BB.    Avoidance of Taxes or Application of Securities Laws (11 U.S.C. § 1129(d)).  No

party in interest that is a governmental unit has requested that the Plan not be confirmed on the

grounds that the principal purpose of the Plan is the avoidance of taxes or the avoidance of the

Page 8

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

application of Section 5 of the Securities Act of 1933.  Therefore the Plan satisfies the

requirements of 11 U.S.C. § 1129(d).

CC.    Solicitation and Tabulation of Acceptances.  As evidenced by the Declaration of

Jeffrey S. Stein of the Garden City Group, Inc. Certifying Methodology for the Tabulation of

Votes and Results of Voting With Respect to the Joint Reorganization Plan of Trenton

Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center

Operating Company, L.P., the solicitation and tabulation of acceptances was accomplished in a

proper, fair and lawful manner and the Plan has been duly accepted by all holders of Claims

whose acceptance is required in accordance with the provisions of 11 U.S.C. § 1126(b).

DD.    Plan Transfers.  All transfers of real or personal property by Debtors are transfers

under the Plan and are, therefore, free from the imposition of taxes of the kind specified in 11

U.S.C. § 1146(a).

EE.    Modification of the Plan.  The modifications of the Plan pursuant to this

Confirmation Order are non-material and do not adversely change the treatment of the holders of

any Claim or Equity Interest under the Plan.  In accordance with 11 U.S.C. § 1127 and

Bankruptcy Rule 3019, all holders of Claims who voted to accept the Plan are hereby deemed to

have accepted the Plan, as amended in this Confirmation Order.  No holder of a Claim who has

voted to accept the Plan shall be permitted to change its acceptance to a rejection as a

consequence of the terms of this Confirmation Order.  Disclosure of the modifications to the Plan

Page 9

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

as set forth in this Confirmation Order on the record at the Confirmation Hearing constitutes due

and sufficient notice thereof.

FF.    Settlements. Debtors' settlement with the Committee, as further discussed below,

was made in the best interest of Debtors and their estates and is hereby approved by the Court

pursuant to Bankruptcy Rule 9019.  The Committee has withdrawn its informal objection to the

Plan.

IT IS HEREBY ORDERED THAT:

1.    The Plan is CONFIRMED.

2.    Except as otherwise provided herein, to the extent the terms of this Confirmation

Order and the Plan differ, the provisions of this Confirmation Order shall control.

3.    On the Effective Date, all property of the estates shall vest in the Reorganized

Debtors and Debtors are hereby discharged pursuant to 11 U.S.C. § 1141.

4.    Upon the Effective Date, this Confirmation Order voids any prior judgment

obtained against Debtors and operates as an injunction as provided in 11 U.S.C. § 524.

5.    All Professional Persons claiming compensation and reimbursement of a

Professional Claim in connection with services rendered to Debtors in these Chapter 11 Cases,

shall file their application for payment of its Professional Claim on or before 60 days from the

Effective Date.

6.    Debtors or Reorganized Debtors, as the case may be, are authorized to execute,

deliver, file or record such contracts, instruments, releases, satisfactions, indentures and other

Page 10

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

agreements or documents and take such actions as may be necessary or appropriate to effectuate
and further evidence the terms and conditions of the Plan and any notes or securities issued
pursuant to the Plan.

7.        This Court shall retain jurisdiction of these Chapter 11 Cases for the purposes
provided in this Confirmation Order, in the Plan, and/or under 11 U.S.C. § 1123.

8.        All trade and service debts and obligations incurred in the normal course of
business during the Gap Period, these Chapter 11 Cases or after the entry of this Confirmation
Order shall be paid in the ordinary course of business, and to the extent not paid (or, in the case
of Gap Period Claims, (a) to the extent that such claim is not on Debtors' schedules as an
undisputed, non-contingent, liquidated claim, or (b) for which no proof of claim was previously
filed pursuant to the Order Granting Motion re: Establishing Bar Date For Filing Proofs of Claim
and Approving Form and Manner of Notice [Dkt. No. 28]), the party asserting such Gap Period
Claim or Administrative Expense shall file a motion with this Court for payment of its Gap
Period Claim or Administrative Expense no later than 60 days after the Effective Date.

9.        The Reorganized Debtors are appointed as the Plan Administrator and will be
responsible for any objections to Claims, and for making all Distributions required under the
Plan.  Professionals retained by the Plan Administrator shall receive hourly fees for services
rendered and expenses incurred after the Effective Date.  The Plan Administrator is not required
to obtain Court authority to retain Professionals and Professionals retained by the Plan
Administrator are not required to obtain Court approval of their fees and expenses.

*Approved by Judge Gloria M. Burns January  24, 2008*

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

10.    This Court shall retain jurisdiction specifically to decide and determine any

disputes with respect to the validity or amount of a Claim against Debtors arising prior to the

Record Date, during the Gap Period and during the period prior to the Effective Date.

11.    Objections to any Claims shall be filed as set forth in the Plan.

12.    The provisions of the Plan, including but not limited to the treatment of executory

contracts, procedure for resolving contested claims, and retention of jurisdiction, are hereby

incorporated into this Confirmation Order, as if made a part hereof.  Any executory contracts or

unexpired leases not assumed or rejected by prior Order of this Court or under the terms of the

Plan are hereby assumed.

13.    As set forth in Article VI.A. of the Plan, upon the Effective Date, Debtors, the

Committee, and all parties-in-interest will be deemed to have waived their right to pursue

Avoidance Actions against any Person.

14.    On the Effective Date, Reorganized Debtors shall execute a subordinated

promissory note, mortgage and security agreement (collectively the "Class 6 and 7 Agreements")

in substantially the forms attached hereto as Exhibits "A", "B" and "C".  The mortgage, security

interests and liens granted under the Class 6 and 7 Agreements shall be subordinated and junior

in priority to the mortgage, security interests and liens that Reorganized Debtors, under the terms

of the Plan, will grant to MFL in connection with the Exit Facility and to the Indenture Trustee

for the benefit of the 2007 Bondholders, and the Class 6 and 7 Agreements and the mortgage,

security interests and liens granted thereunder shall be fully subject to the terms of the Junior

Page 12

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

Lien Intercreditor Agreement (defined below).  If Debtors refinance the 2007 Bonds or the Exit

Facility, the note, mortgage, security interest and liens held by the Agent (defined below) shall

continue to be subject to the Junior Lien Intercreditor Agreement and junior in priority to the

mortgage, security interests and liens held by any entity that provides refinancing but only to the

extent of any amount owed immediately prior to such refinancing on account of the 2007 Bonds

or the Exit Facility, as appropriate.

     15.    Healthcare Services Group Inc. ("HCSG") is hereby appointed as agent for

holders of Allowed Claims in Class 6 and Class 7 solely for the purposes of (i) holding the Class

6 and 7 Agreements and (ii) receiving and distributing, to the former members of the Committee,

the reports, certifications and other information that Debtors are required to provide to agent

pursuant to paragraphs 28 and 32 below.  HCSG may cease acting as agent by providing 30 days

written notice to (a) the Reorganized Debtors; (b) MFL, or any successor; (c) the Indenture

Trustee; and (d) each of the former members of the Unsecured Creditors Committee; provided

however that HCSG's resignation will not become effective unless and until a successor Agent is

appointed either by (i) a majority vote of the former members of the Unsecured Creditors

Committee or (ii) an order of the Court.   HCSG may be replaced at any time as agent by a

majority vote of the former members of the Committee or court order.  HCSG, or any successor

agent, shall be referred to as "Agent" herein.

Page 13

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

16.     The Agent shall serve without any compensation or reimbursement of expenses

from Debtors or the Reorganized Debtors, except for any costs of collection to which the Agent

may become entitled upon default as more particularly set forth in the Class 6 and 7 Agreements.

17.     The Agent shall not be deemed a fiduciary, nor does Agent owe any fiduciary

duties to the holders of Allowed Claims in Class 6 and Class 7, the Debtors, the Reorganized

Debtors, MFL or the Indenture Trustee.  The Agent is not required to take or not to take any

action on behalf of the holders of Allowed Claims in Class 6 or Class 7, or any of them, unless

(a) the Agent consents to take such action and (b) the holders of Allowed Claims in Class 6 or

Class 7, or any of them that request the Agent to take such action, provide compensation, in the

amount and manner acceptable to the Agent, to compensate the Agent for the costs, including

any professional fees, incurred by the Agent.

18.     The Agent and its respective officers, directors, employees, attorneys, and

representatives, shall not incur any liability to any of the Debtors, the Reorganized Debtors, or

any holder of a Claim against, or Interest in, the Debtors, or any of their successors, or any other

person, for any act, failure to act, or omission in connection with, or arising out of, the Junior

Lien Intercreditor Agreement, the Plan, the Confirmation Order or the Class 6 and 7 Agreements,

or the negotiation of any of them, except for willful misconduct or gross negligence, and, in all

respects, the Agent shall be entitled to rely upon the advice of its counsel with respect to its

duties and responsibilities under the Plan, the Confirmation Order, the Class 6 and 7 Agreements

and the Junior Lien Intercreditor Agreement.  In no event shall the Agent be liable to any person

Page 14

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.

_____

or entity for damages resulting from causes beyond the reasonable control of the Agent, and in

no event shall the Agent be liable for incidental, special or consequential damages.

19.    On the Effective Date, Reorganized Debtors, the Agent, the Indenture Trustee and

MFL shall enter into a Junior Lien Intercreditor Agreement substantially in the form attached

hereto as Exhibit "D", with the schedules thereto subject to revision prior to the Effective Date

upon finalization of the documents pertaining to the Exit Facility and to the 2007 Bonds.

Execution and recordation of the Junior Lien Intercreditor Agreement is hereby added as an

Effective Date Condition under the Plan.  Reorganized Debtors shall cause the Junior Lien

Intercreditor Agreement to be recorded in the real estate records of the County of Mercer, State

of New Jersey, and in all offices in which records of the Debtors' real property are filed.

20.    On the Effective Date, the Reorganized Debtors shall issue the 2007 Bonds and

enter into the contracts, agreements and other documents necessary and required to complete

closing.

21.    (a) Neither the Agent nor any individual holder of a Claim in Class 6 and Class 7

shall have any right or authority to enforce any remedy for a default under any of the Class 6 and

7 Agreements, the Plan or the Confirmation Order, by foreclosing upon or otherwise seeking to

encumber, attach, obtain a judgment or an injunction with respect to any of the Working Capital

Collateral or the Bondholder Collateral (both as defined in the Junior Lien Intercreditor

Agreement) until all of the Working Capital Debt and the Bond Debt (both as defined in the

Junior Lien Intercreditor Agreement) have been indefeasibly paid in full.  Notwithstanding the

Page 15

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

foregoing, any individual holder of a Class 6 or Class 7 Claim shall be entitled to enforce any

remedy for a default under the Plan or Confirmation Order with respect to (x) any claims or

interests of  such holder under the Plan or Confirmation Order other than as a holder of an

Allowed Class 6 or 7 Claim, and (y) any claims, causes of action, or other rights or remedies that

first accrue after the Effective Date of the Plan.

(b)      If the Reorganized Debtors and/or Plan Administrator fail to comply with their

obligations under the Plan and/or the Confirmation Order, the Agent or any individual holder of

an Allowed Class 6 or 7 Claim may commence an action or proceeding against the Reorganized

Debtors and/or the Plan Administrator, in this Court or in any other court of competent

jurisdiction, to enforce the Agent's or such holder's rights under the Plan and/or the

Confirmation Order.

22.      The Agent shall not act as a disbursing or noticing agent for the holders of

Allowed Class 6 and Class 7 Claims.  Debtors are required to make all Distributions and to

provide any notices required under the Plan to be directly given to holders of Allowed Class 6

and Class 7 Claims.

23.      Interest at the then-prevailing federal judgment interest rate shall accrue on any

amount that was due to the holders of Allowed Claims in Class 6 and Class 7 during any period

that Reorganized Debtors and/or the Plan Administrator, or either of them, are in default under

their obligations owed to the Agent and/or the holders of Allowed Claims in Class 6 and Class 7

pursuant to the Promissory Note, the Plan and/or this Order.  Interest shall not become due and

Page 16

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

owing until (a) the Reorganized Debtors, the Plan Administrator, or any of them, admit that a

default exists; or (b) a final adjudication is made that the Reorganized Debtors, the Plan

Administrator, or any of them, are in default, *provided however* that, upon such

acknowledgement or adjudication, interest shall commence accruing as of the first date of

default.

24.     The Funds Flow set forth at Article IV.F. of the Plan is hereby amended and

replaced in its entirety with the following:

a.      Operating and maintenance expenses (includes 50% of the 4.5%

Management Fee), to be paid in the ordinary course.

b.      NJEDA and United States Trustee fees, if any, to be paid quarterly, but

reserved monthly;

c.      Amounts due under the New Loan and Security Agreement and the New

Indenture with respect to the New Tax-Exempt Bonds and the New Taxable Bonds, reserved

monthly and paid as provided in the New Loan and Security Agreement and the New Indenture;

d.      Deposit to Cap Ex Fund as provided in Article IV.D.5 of the Plan,

reserved and paid monthly;

e.      2.25% of gross patient services revenue split equally between Seniors

(1.125%, which payment shall be 25% of the 4.5% of the Management Fee) and Allowed Class 6

and Class 7 Claims (1.125%) (such payment to Allowed Class 6 and Class 7 Claims to be

distributed to such holders on a pro rata basis).  Solely pursuant to certified direction from

Page 17

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

Reorganized Debtors, any amount available for distribution to Allowed Class 6 and Class 7

Claims pursuant to this subparagraph e. will be deposited monthly, if such funds are available in

such month, into a reserve account (the "Class 6 and 7 Reserve Account" or the "Class 6 and 7

Claims Account") held by the Indenture Trustee.  The Indenture Trustee shall turn over to the

Plan Administrator any amounts held in the Class 6 and 7 Reserve Account within 10 business

days of receipt of a certified demand for such funds from the Plan Administrator.  The Indenture

Trustee may not be held liable to the Agent, any holders of Allowed Class 6 or Class 7 Claims,

Reorganized Debtors, the Plan Administrator or any other person with respect to the funds it

holds in the Class 6 and 7 Reserve Account and/or turns over to the Plan Administrator pursuant

to this subparagraph, except for gross negligence or willful misconduct, and in all respects shall

be entitled to rely upon the certification provided to it by the Plan Administrator in turning over

funds from the Class 6 and 7 Reserve Account.  Distribution to holders of Allowed Class 6 and

Class 7 Claims pursuant to this subparagraph shall be made by the Plan Administrator only, and

shall be made in conjunction with any payments to be distributed to Allowed Class 6 and Class 7

Claims to be made pursuant to subparagraph j hereof.

    f.  Working Capital Reserve Fund increase – maximum of $75,000 per year

and no more than a total Working Capital Reserve of thirty days cash on-hand (approximately

$900,000), reserved monthly, and paid April 1 each year, as required by the New Loan and

Security Agreement;

Page 18

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

g.      Extraordinary mandatory redemption of New Tax-Exempt Bonds –

maximum of $75,000 per year reserved monthly and paid February 15 each year, as required by

the New Indenture and the New Loan and Security Agreement;

h.      Distributions to Equity Interest Holders equal to any tax liabilities for the

preceding calendar year at the maximum marginal rate, such Distribution to be made annually on

April 1, beginning April 1, 2008, as required by the Term Sheet;

i.      Payment of the remaining 25% of the Management Fee to Seniors

(1.125% of gross patient revenue);

j.      Pro rata Distributions as provided for in the Plan in Article III.B.3 to

holders of Allowed Class 6 and Class 7 Claims as such funds become available.  Solely pursuant

to certified direction from Reorganized Debtors, any amount available for Distribution to

Allowed Class 6 and Class 7 Claims under this subparagraph j. also will be deposited monthly,

as such funds become available, into the Class 6 and 7 Reserve Account held by the Indenture

Trustee.  The Indenture Trustee shall turn over to the Plan Administrator any amounts held in the

Class 6 and 7 Reserve Account within 10 business days of receipt of a certified demand for such

funds from the Plan Administrator.  The Indenture Trustee may not be held liable to the Agent,

any holders of Allowed Class 6 or Class 7 Claims, Reorganized Debtors, the Plan Administrator

or any other person with respect to the funds it holds in the Class 6 and 7 Reserve Account

and/or turns over to the Plan Administrator pursuant to this subparagraph, except for gross

negligence or willful misconduct, and in all respects shall be entitled to rely upon the

Page 19

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

certification provided to it  by the Debtors with regard to deposits to the Class 6 and 7 Claims

Account and by the Plan Administrator in turning over funds from the Class 6 and 7 Reserve

Account.  Distribution to holders of Allowed Class 6 and Class 7 Claims pursuant to this

subparagraph shall be made by the Plan Administrator only, and shall be made in conjunction

with any payments to be distributed to Allowed Class 6 and Class 7 Claims pursuant to

subparagraph e. hereof.

        k.      Pro rata Distributions to Equity Interest Holders, as funds become

available from operations after the Effective Date.

    25.     Distributions to holders of Allowed Class 6 and Class 7 Claims will be payable on

the thirtieth day of the month following the end of each calendar quarter (i.e. payment for the

first quarter will be due on April 30), if and to the extent such funds are available pursuant to

subparagraphs 24.e. and j. herein.

    26.     With regard to the provisions in paragraphs 24.e., above, funds will only be

reserved for distribution if they are available under the Funds Flow in a given month.  If funds

are not available at step e. of the Funds Flow for distribution in a given month then payment to

the Allowed Class 6 and Class 7 Claims under paragraph 24.e. will not accrue, and no payments

under paragraph 24.e. will be made.

    27.     With regard to the provisions in paragraphs 24.e. and i., above, the split of the

subordinated portion of the Management Fee shall only occur while Seniors or another insider of

Reorganized Debtors or Seniors manages the Facility.  If the manager is replaced with a non-

Page 20

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

insider third party under the terms of the New Loan and Security Agreement, then the

subordinated Management Fee payable at step e. of the Funds Flow will be payable in full to the

new manager at step e., no payment will be made to Seniors or the new manager at step i., and

the holders of Allowed Class 6 and Class 7 Claims shall only be entitled to payment from funds

available, if any, at step j.

28.    The Agent's right to request documents from Debtors shall be equal to those of

the Indenture Trustee, including, without limitation, any monthly requisition reports.  No later

than April 30 of each year, Debtors also shall provide Agent and the Indenture Trustee with a

separate certification from its CFO in which Debtors will disclose what Operating's separate tax

liability would be if reported separately from Seniors Healthcare's consolidated tax return.

29.    The Agent will be permitted, but not required, to disseminate these reports to

former members of the Committee upon their request and solely for purposes of monitoring

compliance with the Plan and this Confirmation Order subject to a confidentiality agreement

reasonably acceptable to Debtors.

30.    Reorganized Debtors agree that neither of them will make any payment to any

insider of Reorganized Debtors until Allowed Class 6 and Class 7 Claims have been paid in full,

other than:

       a.    the Management Fee;

       b.    the Lease payments made by Operating to Associates;

Page 21

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.

_____

c.       payments due to MFL with respect to the Working Capital Debt (as

defined in the Junior Lien Intercreditor Agreement);

d.       payments to Lazovitz, Inc. or to another affiliate, for maintenance and

repair work, which will be billed at not greater than market rates on a time and material basis;

e.       payments to the paymaster account managed by Seniors Healthcare to

fund payroll;

f.       payments to the 401(k) account managed by Seniors Healthcare;

g.       payments of benefits to the Facility's administrator in accordance with

past practices;

h.       payments for Debtors' share of the accounting services provided by

Seniors as determined in accordance with past practices;

i.       payment for Debtors' share of the medical director's salary and benefits as

determined in accordance with past practices;

j.       payment of insider employees put in place on a temporary basis to fill a

vacancy at the Debtors, at market rates;

k.       no more than $5,000 in one single month and $25,000 per year for any

other services or goods provided by an insider, billed at market rates, absent approval of the

Agent.  The Agent shall not be liable to Debtors, Reorganized Debtors, any holder of Allowed

Class 6 or 7 Claims, or any other person or entity, based upon any approval or failure to give

approval, made under this subparagraph k;

*Approved by Judge Gloria M. Burns January  24, 2008*

Page 22

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company, L.P.
_____

l.      any payments made to the Indenture Trustee.  (This subparagraph (l) does not in any way admit or imply that the Indenture Trustee is an insider of Reorganized Debtors.)

31.      Debtors shall not terminate or modify the terms of the Lease, the Day Care Lease or the Management Agreement to the financial detriment of the Facility or Allowed Class 6 and Class 7 Claims.  Debtors may voluntarily terminate the Day Care Lease prior to the end of the leasehold term provided financial accommodations are made by Seniors Healthcare or one of its subsidiaries or related companies in an amount equivalent to rent that would otherwise be paid.  Nothing in this paragraph shall be deemed to expand the Debtors' rights under the 2007 Bond Documents, and in no event shall the Debtors be authorized to terminate or modify the Lease, the Day Care Lease or the Management Agreement if such termination or modification is not permitted under the 2007 Bond Documents.

32.      Debtors shall provide an annual certification to the Agent and the Indenture Trustee on or before January 31st of each year indicating that:  (a) Debtors have complied with the Funds Flow as set forth in paragraph 24 hereof; (b)  Debtors made no payments to insiders beyond those permitted in paragraph 30 above; and (c) Debtors have complied with the negative covenants discussed in paragraph 31, above.

33.      It is an event of default under the Plan if:

a.      Debtors fail to provide the annual certification required under paragraph 32, subject to a right to cure 15 days after receipt of written notice of such failure from the Agent or Indenture Trustee; or

Page 23

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.

_____

        b.     The certification to be provided pursuant to paragraph 32 is materially false (materiality for the purposes of this provision will be any misstatement of more than $10,000 with respect to payments to insiders).

        c.     If there is a default under subparagraph a. or b., above, or if Debtors otherwise fail to comply with the provisions of the Plan and/or this Order, the Agent is authorized but not required to, and any individual holders of Allowed Claims in Class 6 or Class 7 or the Indenture Trustee may take action against the Reorganized Debtors and/or the Plan Administrator to enforce the provisions of the Plan and/or this Order, subject to the terms of the Junior Lien Intercreditor Agreement and paragraph 21 hereof.

34.     To the extent not set forth in the Plan, both Debtors shall comply with the requirements of the Funds Flow.

35.     To correct a reference error in the Plan, the Definition of "Effective Date Distribution" under the Plan is hereby amended to state as follows:

        <u>Effective Date Distribution</u> means any Distribution required to be made pursuant to Article IV.D. of this Plan.

36.     The Plan Administrator is directed to make Distributions to holders of Claims in Classes 4 through 7 under the Plan or this Order only to holders of Allowed Claims in those classes.  The Plan Administrator is directed to make all Distributions with respect to classes 1, 2 and 3 under the Plan to the Indenture Trustee.

Page 24

Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating
Company, L.P.

Case No.: 07-25874 (GMB)

Order Confirming the Joint Plan of Reorganization of Trenton Convalescent Center Urban Renewal Associates, L.P.
and Trenton Convalescent Center Operating Company, L.P.
_____

      37.     NJEDA shall have no responsibility for the implementation of the Plan except for

the issuance of the New Taxable Bonds and the New Tax-Exempt Bonds in accordance with the

terms of the New Indenture and New Loan Agreement, and except as aforesaid, none of the

Agent, Debtors, Reorganized Debtors or holders of Allowed Class 6 or 7 Claims shall have any

rights or claims against NJEDA of any kind whatsoever arising out of the Plan or any related

matter.

CHERRY_HILL\421241\11  215438.000

## PROMISSORY NOTE

$4,110,000.00
January ___, 2008

FOR VALUE RECEIVED, Trenton Convalescent Center Urban Renewal Associates, L.P., and Trenton Convalescent Center Operating Co., L.P. ("Borrowers"), hereby promise to pay to the order of Healthcare Services Group Inc., solely in its capacity as the Agent for holders of Allowed Claims (as defined below) (the "Agent"), the principal amount of Four Million One Hundred Ten Thousand Dollars and 00/100 Dollars ($4,110,000.00), or so much thereof as shall become Allowed Claims in Classes 6 and 7 that are entitled to distribution ("Allowed Claims") pursuant to the terms and conditions of the Joint Reorganization Plan of Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Co., L.P. dated August 2, 2007 (the "Plan") and the Confirmation Order of the United States Bankruptcy Court for the District of New Jersey which confirmed the Plan (the "Confirmation Order"). Borrowers shall make payments of principal under this Note as, and only as provided for and at such time or times and in the manner specified in the Plan and Confirmation Order, and in particular payments shall only be made as funds become available and in the priorities required under the Funds Flow (as defined in the Confirmation Order).

The payment and performance of this Note is issued under and secured by that certain Subordinated Security Agreement dated as of even date herewith between the Borrowers and the Agent (as from time to time amended, restated, supplemented or otherwise modified, the "Security Agreement") and that certain Mortgage dated as of even date herewith between Associates and the Agent. Terms used herein and not defined herein are used with the respective meanings set forth in the Security Agreement.

Interest shall not accrue under this Note except that interest at the then-prevailing federal judgment interest rate shall accrue on any amount that was due to the holders of Allowed Claims in Class 6 and Class 7 during any period that Borrowers are in default under their obligations owed to the Agent and/or the holders of Allowed Claims in Class 6 and Class 7 pursuant to this Promissory Note, the Plan and/or the Confirmation Order. Interest shall not become due and owing until (a) Borrowers admit that a default exists; or (b) a final adjudication is made that Borrowers are in default, *provided however* that, upon such acknowledgement or adjudication, interest shall commence accruing as of the first date of default.

In the event that Borrowers fail to comply with their obligations under this Promissory Note, the Plan and/or the Confirmation Order, the Agent shall have the option of treating the entire then remaining principal balance due under this Note as being immediately due and payable. Failure to exercise such an option shall not constitute a waiver of the right to exercise such option at any other time if the conditions set forth in the proceeding sentence have been satisfied. If the Borrowers are found to be in default of this Promissory Note, the Plan and/or the Confirmation Order by Borrowers' admission or final adjudication, they shall have the right to cure said default amount (not the accelerated balance) within thirty (30) days and this Note shall be decelerated and otherwise remain in full force and effect.

*Approved by Judge Gloria M. Burns January  24, 2008*

The Borrowers shall reimburse the Agent for any costs, including attorneys' fees, incurred in connection with enforcing this Promissory Note, the Plan and/or the Confirmation Order.  The Agent's costs incurred in connection with enforcing this Promissory Note, the Plan and/or the Confirmation Order shall not become due and owing until:  (a) the Borrowers admit that a default exists; or (b) a final adjudication is made that Borrowers are in default.

The Borrowers waive presentment, demand for payment, notice of dishonor, protest and notice of protest, and any and all other notices or demands in connection with this Note, except any notice expressly required by the Plan or Confirmation Order.

This Note shall be governed by and construed in accordance with New Jersey law.

IN WITNESS WHEREOF, Borrowers, intending to be legally bound hereby, have each duly executed this Note, as of the date and year first above written.

TRENTON CONVALESCENT CENTER URBAN
RENEWAL ASSOCIATES, L.P

Witness:                                                    By:  S.D.K. Associates, LP, its General Partner

_____                 By:_____
                                                                  Names:  Lenard Brown
                                                                  Title:      Vice President

TRENTON CONVALESCENT CENTER
OPERATING CO., L.P.

Witness:                                                    By:  Ozal, Inc., its General Partner

_____                 By:_____
                                                                  Names:  Lenard Brown
                                                                  Title:      Vice President

2

*Approved by Judge Gloria M. Burns January  24, 2008*

**Consult your Lawyer before signing this mortgage - it has important legal consequences.**

# MORTGAGE

This Mortgage is made and dated January ___, 2008

Between

**Mortgagor**

*Address: Include no., street, county, state and zip*

Trenton Convalescent Center Urban Renewal Associates L.P.
1114 Wynwood Avenue
Cherry Hill, NJ 08002

(from now on called the "Mortgagor")

And

**Mortgagee**

*Address: Include no., street, county, state and zip*

Healthcare Services Group Inc., solely in its capacity the Agent for holders of Allowed Claims in Classes 6 and 7 that are entitled to distribution pursuant to the terms and conditions of the Joint Reorganization Plan of Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Co., L.P. (the "Plan") dated August 2, 2007 and the Confirmation Order of the United States Bankruptcy Court for the District of New Jersey which confirmed the Plan (the "Confirmation Order")

3220 Tillman Drive
Glenview Corporate Center
Suite 300
Bensalem PA 19020

(from now on called the "Mortgagee")

The words Mortgagor and Mortgagee include all mortgagors and all mortgagees under this Mortgage.

**Note**

1.   The Mortgagor and Trenton Convalescent Center Operating Company, L.P. ("Operating") have signed a Promissory Note dated January ___, 2008 in the sum of Four Million One Hundred Ten Thousand Dollars ($4,110,000.00) or so much thereof as shall become Allowed Claims in Classes 6 and 7 that are entitled to distribution ("Allowed Claims") (from now on called the "principal") for the benefit of the Mortgagee pursuant to the Plan and Confirmation Order, from now on called the "Note." Payments of principal under the Note shall be made as, and only as, provided for and at such time or times and in the manner specified in the Plan and Confirmation Order, and in particular payments shall only be made as funds become available and in the priorities required under the Funds Flow (as defined in the Confirmation Order).

All of the terms of the Note are made part of this Mortgage.

**Mortgage as Security**

2.   The purpose of this Mortgage is to give the Mortgagee security for the payment of the principal under and performance of the Note, all of the liabilities of the Mortgagor and Operating for Allowed Claims, and the performance by Mortgagor and Operating of their obligations under the Plan and the Confirmation Order, and the payment and performance of this Mortgage (collectively, the "Obligations"). The Mortgagor mortgages to the Mortgagee the property described in (a) through (d) below (from now on called the "Property"):

(a)  All of the land located in the ___ of ___ County of ___ and State of New Jersey, specifically described as follows:

Street address ___

Municipal tax map designation: Lot No. ___ Block No. ___

This Mortgage was prepared by

*Jerrold N. Poslusny, Jr.*

Print or type name.

Signature.

(b)  All buildings and other improvements that now are or will be located on the land.

(c)  All fixtures, equipment, and personal property that now are or will be attached to or used with the land, buildings, and other improvements.

(d)  All other rights which the Mortgagor now has or will acquire with regard to the land.

**Mortgage Void on Full Payment**

3.  When the Mortgagor pays or otherwise satisfies the Obligations, the Mortgagee's rights under the Note and this Mortgage shall end.  At the request and expense of the Mortgagor, the Mortgagee shall cancel this Mortgage of record.

**Promises of Borrower**

4.  The Mortgagor makes these promises to Mortgagee:

**Compliance**

(a)  The Mortgagor shall comply with all of the terms of the Note, Plan, Confirmation Order, that certain Subordinated Security Agreement dated as of even date herewith between Mortgagor and Operating, on the one hand, and the Agent on the other hand (as from time to time amended, restated, supplemented or otherwise modified), and this Mortgage.

**Payments**

(b)  The Mortgagor shall make payments only as provided for and at such time or times and in the manner specified in the Plan and Confirmation Order, in particular payments are only required to be made as funds become available and in the priorities required under the Funds Flow (as defined in the Confirmation Order).

**Ownership**

(c)  The Mortgagor owns and has the right to mortgage the Property to the Mortgagee.  The Mortgagor shall defend this ownership against all claims.

**Payment of Taxes, etc.**

(d)  The Mortgagor shall pay when due all real estate taxes, assessments, water and sewer charges, and other charges against the Property.

**No Credit For Taxes Paid**

(e)  The Mortgagor shall not claim or be entitled to any credit against the principal under the Note and this Mortgage for taxes paid on the Property.  The Mortgagor shall not claim any deduction from the taxable value of the Property because of this Mortgage.

**Hazard Insurance**

(f)  The Mortgagor shall maintain hazard insurance on the Property.  This insurance must cover loss or damage caused by fire and other hazards normally included under "extended coverage" insurance.  The Mortgagor shall pay all premiums when due.

In case of loss or damage the Mortgagor shall promptly notify the insurance company and the Mortgagee.  The Mortgagor shall promptly (1) file a proof of loss with the insurance company and (2) settle the claim.

**Repairs**

(g)  The Mortgagor shall keep the Property in good repair.  The Mortgagor shall not damage, destroy or abandon the Property.  The Mortgagee may inspect the Property on reasonable notice to the Mortgagor.

**Eminent Domain**

(h)  Eminent domain is the right of a government to lawfully condemn and take private property for a public purpose.  Fair value must be paid for the taking.  The taking may occur either by court order or by deed to the condemning party.  If all or any part of the Property is taken by eminent domain, the entire payment shall be first applied to senior mortgages against the Property with any remainder to be given to the Mortgagor to be applied this Mortgage.  If this Mortgage is satisfied, any excess shall be returned to Mortgagor.

**Obeying the Law**

(i)  The Mortgagor shall obey all laws, rules and ordinances which apply to the Property.  The Mortgagor shall not use or allow the Property to be used for any illegal purpose.

**Mortgagee Right of Acceleration**

5.  In the event that Mortgagor and Operating fail to comply with their obligations under the Plan and the Confirmation Order, the Agent shall have the option of treating the entire then remaining principal balance due under the Note and any amount due under this Mortgage as being immediately due and payable.  Failure to exercise such option shall not constitute a waiver of the right to exercise such option at any other time if conditions set forth in the preceding sentence have been satisfied.  If the Mortgagor and/or Operating are found to be in default of their obligations by their admission or final adjudication, they shall have the right to cure said default amount (not the accelerated balance) within thirty (30) days and the obligations shall be decelerated and otherwise remain in full force and effect.  Payments are only to be made as provided for and at such time or times in the manner specified in the Plan and Confirmation Order, in particular payments are only required to be made as funds become available and in the priorities required

under the Funds Prow (as defined in the Confirmation Order).

**Notices**

6.  All notices under this Mortgage must be in writing.  They may be given by (a) personal delivery, or (b) certified mail, return receipt requested.  Each party must accept and claim the notices given by the other.  Notices shall be addressed to the other party at the address written at the beginning of this Mortgage.  Either party may notify the other of a change of address.

**Mortgage Binding on Successors**

7.  This Mortgage is binding on all Mortgagors and all those who lawfully succeed to their rights or take their places.

**Signatures**

The Mortgagor agrees to all of the terms of this Mortgage by signing below.  If the Mortgagor is a corporation, this Mortgage is signed by its proper corporate officers and its corporate seal affixed.

**The Mortgagor has received a true copy of this Mortgage without charge.**

_____(SEAL)

_____(SEAL)

_____(SEAL)

Witnessed or attested by:

_____         _____(SEAL)

## CERTIFICATE OF ACKNOWLEDGMENT BY INDIVIDUAL

**State of New Jersey, County of ___**

I am a ___
an officer authorized to take acknowledgments and proofs in this State. I sign this acknowledgment below to certify that it was made before me.

On ____, ___

appeared before me in person.  *(If more than one person appears, the words "this person" shall include all persons named who appeared before the officer and made this acknowledgment).*  I am satisfied that this person is the person named in and who signed this Document.  This person acknowledged signing, sealing and delivering this Document as this person's act and deed for the uses and purposes expressed in this Document.

.........................................................................................................
*Officer's signature.  Print, stamp or type name and title directly beneath.*

## CORPORATE PROOF BY THE SUBSCRIBING WITNESS

**State of New Jersey, County of**

I am a ___
an officer authorized to take acknowledgments and proofs in this State.

On ___, ___

(from now on called the "Witness") appeared before me in person.  The Witness was duly sworn by me according to law under oath and stated and proved to my satisfaction that:

1.  The Witness is the ___ Secretary of the Corporation named in the Document.

2.  ___ the officer who signed this Document, is the ___ President of the Corporation (from now on called the "Corporate Officer").

3.  The making, signing, sealing, and delivery of this Document have been duly authorized by a proper resolution of the Board of Directors of the Corporation.

4.  The Witness knows the corporate seal of the Corporation.  The seal affixed to this Document is the corporate seal of the Corporation. The seal was affixed to this Document by the Corporate Officer.  The Corporate Officer signed and delivered this Document as and for the voluntary act and deed of the Corporation.  All this was done in the presence of the Witness who signed this Document as attesting witness.  The Witness signs this proof to attest to the truth of these facts.

Sworn to and signed before me on the date written above.

_____         _____
*Officers signature.  Print, stamp or type name and title directly beneath*                          *Witness: sign above and print or type name below*

| To the Register or Clerk, ___ County: ___ | **Record and return to:** |
|---|---|
| This mortgage is fully paid. I authorize you to cancel it of record. | |
| Mortgagor: | |
| ...................................................………...………………… | |
| I certify that the Mortgagor's signature is genuine. | |
| ……………………………………….. | |

## SUBORDINATED SECURITY AGREEMENT

THIS SECURITY AGREEMENT is made and entered into this _____ day of January, 2008, by and among Trenton Convalescent Center Operating Co., L.P. ("Operating") and Trenton Convalescent Center Urban Renewal Associates, L.P. ("Associates" and with Operating, "Debtors"), and Healthcare Services Group Inc., solely in its capacity as agent ("Agent") for holders of Allowed Claims in Classes 6 and 7 that are entitled to distribution pursuant to the terms and conditions of the Joint Reorganization Plan of Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Co., L.P. dated August 2, 2007 (the "Plan") and the Confirmation Order of the United States Bankruptcy Court for the District of New Jersey which confirmed the Plan (the "Confirmation Order").  For purposes of this Agreement, the Agent is referred to as the "Secured Party."

For purposes of this Security Agreement:

A.    "Accounts" means (a) all accounts, accounts receivable, payment intangibles, instruments, chattel paper and all other rights of Debtors to receive payments including without limitation, the third party reimbursable portion of accounts receivable owing to Debtors arising out of the delivery by Debtors of medical, surgical, diagnostic, treatment or other professional or medical or healthcare related services and/or the supply of goods related to any of such services (whether such services are supplied by Debtors or a third party), including without limitation all health-care-insurance-receivables and all other rights to reimbursement under any agreements with an Obligor, (b) all accounts, general intangibles, rights, remedies, guarantees, supporting obligations, letter of credit rights, and security interests in respect of the foregoing and all rights of enforcement and collection, all books and records evidencing or related to the foregoing, (c) all information and data compiled or derived by Debtors in respect of such

*Approved by Judge Gloria M. Burns January  24, 2008*

accounts receivable (other than any such information and data subject to legal restrictions of

patient confidentiality), and (d) all proceeds of any of the foregoing.

      B.      "Advance(s)" means any monies advanced or credit extended, including

without limitation, the Loans, to or for the benefit of Debtors by MFL under the Credit Facility.

      C.      "Authority" means the New Jersey Economic Development Authority.

      D.      "Business" refers to the Debtors' business operating at the Premises.

      E.      "Collateral" refers to all of the Debtors' right, title and interest in and to

all of the assets of Debtors whether now existing or hereafter arising or acquired, including,

without limitation: (a) all accounts, payment intangibles, instruments and other rights to receive

payments of Operating (including without limitation the Accounts), whether now existing or

hereafter arising or acquired, (b) all general intangibles (including without limitation, contract

rights and intellectual property, good will, and Operating's certificate of need and related

licenses to operate a long-term care and residential care facility), chattel paper, documents,

supporting obligations, letter of credit rights, commercial tort claims, investment property, rights,

remedies, guarantees and collateral and anything evidencing, securing or otherwise relating to or

associated with the foregoing, including without limitation all rights of enforcement and

collection, (c) all commercial lockboxes, all government lockboxes, all bank accounts and other

deposit accounts into which any of the Collections or Advances are deposited, all funds received

thereby or deposited therein, and any checks or instruments from time to time representing or

evidencing the same, (d) all documents, books and records of Debtors evidencing or relating to

or associated with any of the foregoing, (e) all information and data compiled or derived by

Debtors with respect to any of the foregoing (other than any such information and data subject to

legal restrictions of patient confidentiality), (f) all equipment, (g) all inventory, and (h) all

*Approved by Judge Gloria M. Burns January  24, 2008*

additions, replacements, accessions, substitutions, collections, receipts and other proceeds (cash and noncash) derived from any of the foregoing.

F.    "Collections" means with respect to any Account, all cash collections on such Account.

G.    "Credit Facility" means the line of credit facility established by MFL for the benefit of Debtors.

H.    "Indenture Trustee" means U.S. Bank National Association, in its capacity as Trustee for those certain First Mortgage Bonds (The Millhouse Project – 2007 Series A and B) issued by the Authority pursuant to the terms of the Indenture of Trust, dated as of January ___, 2008.

I.    "Premises" means 1114 Wynwood Avenue, Cherry Hill, New Jersey 08002.

J.    "MFL" means Millhouse Funding, LLC (or a third party working capital and/or accounts receivable lender which would replace MFL).

K.    "Note" means that certain Promissory Note dated January ___, 2008, in the sum of _____ ($_____), or so much thereof as shall become Allowed Claims in Classes 6 and 7 that are entitled to distribution ("Allowed Claims") (from now on called the "principal"), made by Debtors for the benefit of the Secured Party, pursuant to the Plan and Confirmation Order.

L.    "Obligations" means the Debtors' obligations and liabilities for the payment of principal under and performance of the Note, for Allowed Claims in Classes 6 and 7 to the extent entitled to receive distribution pursuant to the terms and conditions of the Plan and

3

*Approved by Judge Gloria M. Burns January  24, 2008*

the Confirmation Order, the performance by Debtors of their obligations under the Plan and

Confirmation Order, and the payment and performance of this Agreement.

      M.    "Proceeds" shall mean all proceeds as defined in the Uniform Commercial

Code and shall additionally include whatever is received upon the use or other utilization or

disposition of any Collateral granted to the Secured Party in the Security Agreement as set forth

herein, whether cash or non-cash, including but not limited to all accounts, chattel paper,

instruments, documents, contract rights, general intangibles, inventory, insurance proceeds and

all proceeds of the foregoing.

      N.    "2007 Bonds" means those First Mortgage Revenue Bonds (The

Millhouse Project – 2007 Series A and B) issued by the Authority pursuant to the Loan and

Security Agreement dated _____, 2008 and in accordance with the Plan.

      NOW, THEREFORE, in consideration of and as security for the Obligations and

intending to be legally bound, the Debtors, jointly and severally, agree as follows:

      1.    The Debtors and the Secured Party acknowledge that pursuant to the Plan and

Confirmation Order, the Debtors have or will be executing in favor of the Authority a Security

Agreement granting to the Authority a senior priority security interest in all of the assets of

Debtors to secure Debtors' obligations in connection with the 2007 Bonds and that the aforesaid

Security Agreement will be perfected by the filing of a UCC-1 Financing Statement with the

New Jersey Department of Treasury.  Debtors and Secured Party acknowledge that the security

interest granted to Secured Party hereunder shall be subordinate to the perfected priority security

interest held by the Trustee for so long as the Debtors' obligations in connection with the 2007

Bonds remain outstanding.  Debtors and Secured Party hereby acknowledge that the Debtors,

Secured Party, Trustee and MFL have executed and delivered a Junior Lien Intercreditor

4

*Approved by Judge Gloria M. Burns January  24, 2008*

Agreement of even date herewith, which sets forth, among other things, the respective rights and obligations of the Secured Party and the Trustee with respect to, and the respective interest of the Secured Party and the Trustee in, the Collateral.

2.      Debtors and the Secured Party acknowledge that pursuant to the Plan and Confirmation Order, Operating has or will be executing in favor of MFL a Security Agreement granting to MFL a priority security interest in certain of the business assets of Operating and that the aforesaid Security Agreement will be perfected by the filing of a UCC-1 Financing Statement with the New Jersey Department of Treasury.  Debtors and Secured Party acknowledge that the security interest granted to Secured Party hereunder shall be subordinate to the perfected  priority security interest held by MFL for so long as the MFL security interest shall remain outstanding. Debtors and Secured Party hereby acknowledge that the Debtors, Secured Party, Trustee and MFL have executed and delivered a Junior Lien Intercreditor Agreement of even date herewith, which sets forth, among other things, the respective rights and obligations of the Secured Party and MFL with respect to, and the respective interest of the Secured Party and MFL in, the Collateral.

3.      The Debtors as security for the payment and performance of the Obligations hereby grant the Secured Party a security interest in the Collateral.  The Secured Party's security interest in the Collateral shall be superior in priority to any other security interest, except that perfected first priority security interest previously granted to the Trustee and MFL as described in Articles 1 and 2, above.  The Security Agreement and the security interest granted herein shall stand as general and continuing security for all Obligations and may be retained by the Secured Party until all Obligations have been satisfied in full.

CHERRY_HILL\421623\9  215438.000

*Approved by Judge Gloria M. Burns January  24, 2008*

4.      The Debtors represent and warrant that the Debtors are the sole owners of all of the assets of the Business.

5.      The Debtors represent and warrant that the Debtors are the sole owners of the Collateral.

6.      The Debtors covenant and agree to keep the Collateral free from, defend against, discharge and immediately notify the Secured Party in writing of, any and all other liens, security interests or encumbrances, prior assignments, claims, set offs or demands of all persons at any time claiming any Collateral or any interest therein, excluding only those claims which arise in the ordinary course of business.

7.      The Debtors covenant and agree not to remove the Collateral now or hereafter located at the Premises from the Premises without the Secured Party's prior written consent, except as the Collateral is being used in the ordinary course of business.  Debtors shall deliver to the Secured Party landlord waivers as requested by the Secured Party for each location not owned by Debtors where the Collateral is now or may hereafter be situated.

8.      The Debtors shall have the right to use, sell or replace the Collateral in the ordinary course of business.

9.      The Debtors covenant and agree that the Debtors will, at any time or times and from time-to-time, at the Debtors' expense, execute and deliver or cause to be executed and delivered such security agreements, certifications, certificates of title, pledges, assignments, financing statements, continuation statements, amendments, acknowledgments and other documents and will perform or cause to be performed such other acts as the Secured Party may reasonably require in order to establish, preserve or maintain a valid and continuously perfected security interest in, or to determine the priority of, or terminate or enforce the Secured Party's

CHERRY_HILL\421623\9  215438.000

*Approved by Judge Gloria M. Burns January  24, 2008*

security interest in, the Collateral, and pay all reasonable costs and expenses incurred in

connection therewith.  To the extent legally permissible, Debtors irrevocably authorize the

Secured Party to execute a financing statement or statements and/or a continuation statement or

statements, or any amendment or amendments thereto, and file the same in those public offices

deemed necessary or appropriate by the Secured Party to establish, maintain and protect and

continuously perfect its security interest in the Collateral.

   10.  The occurrence of any one or more of the following shall constitute a default

under this Agreement:

     a.  Non-payment or non-performance of any of the Obligations, or any

portion thereof, when and in the manner due to be performed, whether due by acceleration or

otherwise;

     b.  Failure of Debtors to observe or perform any covenant, agreement, term or

condition of this Agreement;

     c.  If the either Debtor dissolves, liquidates, merges, sells or otherwise

disposes of substantially all of its assets or ceases to conduct business operations, or prepares or

attempts to do any of the foregoing; or

     d.  The Debtors sell, assign or otherwise transfer or attempts to sell, assign or

transfer any right, title and interest in or to any of the Collateral without the immediate payment

of the proceeds thereof in accordance with the Funds Flow (as defined in the Confirmation

Order).  Notwithstanding anything herein to the contrary, Debtors shall have the authority to sell,

assign or otherwise transfer any right, title and interest in or to any of the Collateral in the

ordinary course of business, provided that the proceeds of such sale, assignment or other transfer

are utilized in accordance with the Funds Flow.

7

*Approved by Judge Gloria M. Burns January  24, 2008*

11.     Except as otherwise provided herein or agreed between the parties, upon the occurrence of a default, the Secured Party may, but is not required to, and any individual holder of an Allowed Claim may exercise any one or more of the following remedies, which are cumulative and may be exercised singly or in any combination at any time and from time to time as long as any default continues, without notice or demand to Debtors, except as expressly required under this Agreement or any applicable provision of law which cannot be waived prior to default:

a.     Declare all or any part of the Obligations immediately due and payable as if the same had in the first instance been payable at such time, without requiring any recourse against any other person or property liable for or securing any of the Obligations.  If the Debtors are found to be in default by Debtors' admission or final adjudication, they shall have the right to cure said default amount (not the accelerated balance) within thirty (30) days and this Note shall be decelerated and otherwise remain in full force and effect;

b.     Exercise all or any of the rights and remedies of a secured party under the Uniform Commercial Code or as a creditor under any other applicable law including, without limitation, the right to require Debtors to assemble and/or surrender the Collateral and any records pertaining thereto and to make them available to the Secured Party at a time and place designated by the Secured Party;

c.     Enter the Premises and take possession of the Collateral and any records pertaining thereto; and also take possession of all personal property located in or attached to the Collateral;

d.     Take such actions as the Secured Party may deem necessary or advisable to preserve, process, develop, maintain, protect, care for or insure the Collateral or any portion

8

*Approved by Judge Gloria M. Burns January  24, 2008*

thereof, and Debtor hereby authorizes the Secured Party to do all acts and things in connection therewith;

       e.      Sell or otherwise dispose of any of the Collateral at any public or private sale at any time or times with or without advertisement or demand upon five (5) calendar days prior written notice to the Debtors, which the Debtors acknowledge and agree to be sufficient and commercially reasonable, with the right of the Secured Party or its nominees to become purchaser at any sale (unless prohibited by statute) free from any equity of redemption and from all other claims, and after deducting all expenses for which the Debtors are responsible pursuant hereto, apply the remaining proceeds of any sale to pay (or hold as a reserve against) any of the Obligations.

       f.      The proceeds of any disposition by the Secured Party of the Collateral shall be applied as follows:

       (i)      First, to the satisfaction of the Obligations;

       (ii)      Second, to pay the Secured Party's costs, including attorneys' fees, to enforce the Obligations.  The Secured Party's costs incurred in connection with enforcing Debtors' Obligations under this Agreement, the Plan and/or the Confirmation Order shall not become due and owing until:  (a) the Borrowers admit that a default exists; or (b) a final adjudication is made that Borrowers are in default;

       (iii)      Third, to the payment of any other amounts required by applicable law; and

       (iv)      Fourth, to the Debtors to the extent of any surplus proceeds, provided, however, that the Secured Party and all holders of Allowed Claims may only exercise

CHERRY_HILL\421623\9  215438.000

*Approved by Judge Gloria M. Burns January  24, 2008*

any remedy provided in paragraphs 11(b) through (f) or otherwise foreclose upon any of the Collateral in accordance with the terms of the Junior Lien Intercreditor Agreement.

12.     Except to the extent limited by a non-waivable provision or statute, the Secured Party shall not be liable to any person whatsoever for, or in connection with, the exercise, method of exercise, delay or failure to exercise any of the remedies provided herein, and the Debtors shall indemnify and hold harmless and waive and release the Secured Party from any and all claims, liabilities, actions, costs, suits, demands, damages or losses whatsoever incurred on account of or in connection with such exercise, method of exercise, delay or failure to exercise.

13.     No delay or failure by the Secured Party in the exercise of any right or remedy shall constitute a waiver thereof, and no single or partial exercise by the Secured Party of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy provided for in this Agreement or otherwise.  The invalidity of any portion of this Agreement shall not affect the remaining portions, or any part thereof, and in case of any such invalidity, this Agreement shall be construed as if such portion had not been inserted.

14.     This Agreement shall be governed and construed in accordance with the  laws of the State of New Jersey, without reference to conflict of laws principles, and without reference to where the Collateral is located.

15.     Debtors and the Secured Party irrevocably agree and consent to the exclusive jurisdiction of the courts of the State of New Jersey, the United States District Court for the District of New Jersey, and/or the United States Bankruptcy Court for the District of New Jersey with respect to any and all disputes, actions or proceedings between the Debtors and the Secured Party arising under this Agreement.  However, the Secured Party is not precluded from bringing

*Approved by Judge Gloria M. Burns January  24, 2008*

an action against the Debtors in any jurisdiction in the United States or elsewhere in which the

Debtors or the Collateral may be located.  Debtors agree not to make any objection in any such

action or proceeding that the venue is improper or the forum is inconvenient.

     16.    This Agreement, the Plan and the Confirmation Order, the Junior Lien

Intercreditor Agreement and the documents executed and delivered pursuant hereto and thereto

and in connection herewith and therewith, constitute the entire agreement between the parties

hereto and may be amended only by writing signed by or on behalf of all parties.

 

TRENTON CONVALESCENT CENTER
URBAN RENEWAL ASSOCIATES, L.P.

Witness:                    By:  S.D.K. Associates, L.P., its General Partner

_____     By:_____
                         Names:  Lenard Brown
                         Title:     Vice President

TRENTON CONVALESCENT CENTER
OPERATING CO., L.P.

Witness:                    By:  Ozal, Inc., its General Partner

_____     By:_____
                         Names:  Lenard Brown
                         Title:     Vice President

HEALTHCARE SERVICES GROUP INC.

Witness:

_____     By:_____
                         Names:  Michael Harder
                         Title:     Vice President, Credit Administration

CHERRY_HILL\421623\9  215438.000

*Approved by Judge Gloria M. Burns January  24, 2008*

## JUNIOR LIEN INTERCREDITOR AGREEMENT

Dated as of January ___, 2008

This Junior Lien Intercreditor Agreement (the "Agreement") is entered into by and among Trenton Convalescent Center Operating Co., L.P. ("Operating") and Trenton Convalescent Center Urban Renewal Associates, L.P. ("Associates" and, together with Operating, "Debtors"); Millhouse Funding, LLC ("Lender"); U.S. Bank National Association, in its capacity as Trustee (the "Trustee") for those certain First Mortgage Bonds (The Millhouse Project –2007 Series A and B) (the "2007 Bonds") issued by the New Jersey Economic Development Authority (the "Authority") pursuant to the terms of an Indenture of Trust, dated as of January __, 2008 (the "Indenture"); and Healthcare Services Group, Inc., solely in its capacity as Agent (the "Agent") for the holders of Allowed Class 6 and 7 Claims[1] under the Joint Reorganization Plan of Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Company, L.P., dated August 2, 2007, (the "Plan") and pursuant to and under the terms of the January 22, 2008 order confirming the Plan (the "Confirmation Order"), as follows:

1. On October 30, 2007 (the "Petition Date"), Debtors filed petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Bankruptcy Court"). Debtors' Plan was confirmed by the Confirmation Order. This Agreement is entered into pursuant to paragraph 19 of the Confirmation Order, and a form of this Agreement is attached as Exhibit D to the Confirmation Order.

2. Operating and Lender are parties to that certain Loan and Security Agreement dated as of _____ (the "MFL Loan Agreement"), whereby Lender has made available to Operating a revolving line of credit (the "Working Capital Line") that is secured by a security interest in and lien upon the assets of Operating listed on Schedule 1 hereto (the "Working Capital Collateral"). The term "Working Capital Debt" as used in this Agreement means all principal and ordinary (*i.e.,* not compounded, not default rate, etc.) interest owed by Operating to Lender under the MFL Loan Agreement; provided that "Working Capital Debt" shall not exceed the total amount of $1,300,000.00 in principal plus ordinary interest.

3. In accordance with the Plan and the Confirmation Order, the 2007 Bonds were issued pursuant to the Indenture, a Loan and Security Agreement, a mortgage, and various notes, leases, assignments, Uniform Commercial Code financing statements, agreements and other documents (all of the foregoing, collectively, the "2007 Bond Documents"), variously executed and/or entered into by parties including without limitation the Debtors, the Trustee,

---

[1] As used in this Agreement, the term "Allowed Class 6 and 7 Claims" shall refer to those Claims classified in Classes 6 and 7 of Debtors' Plan that are or may be entitled to a Distribution under the Plan, (a) proof of which Claim was filed on or before the Bar Date, and, at the time of determination, either (i) no objection to the allowance thereof has been filed within the time allowed by the Plan, or (ii) as to which any objection has been filed, no Final Order has been entered disallowing the Claim, or, (b) if no proof of claim is filed, which has been scheduled by Debtors pursuant to 11 U.S.C. § 521(1) (and not scheduled as disputed, contingent or unliquidated). The terms "Claims", "Distribution" and "Final Order" shall have the meanings ascribed to them in the Plan.

and the New Jersey Economic Development Authority.  Some of the 2007 Bond Documents are listed on the attached Schedule 2, which is included for reference purposes only and shall not limit the definition of 2007 Bond Documents herein.  The term "Bond Debt" as used in this Agreement means all indebtedness, liabilities, and obligations of Operating, Associates, or the Debtors now existing or hereafter arising, to the Trustee with respect to the 2007 Bonds and/or under the 2007 Bond Documents.  Pursuant to the 2007 Bond Documents, the Plan, and the Confirmation Order, the 2007 Bonds are secured by certain rights, title, interests, assets and property described in the 2007 Bond Documents, including without limitation all real and personal property of the Debtors and the License (as defined in the Plan).  The term "Bondholder Collateral" as used in this Agreement means all real and personal property of the Debtors and the License; certain of the Bondholder Collateral is described on the attached Schedule 3, which is included for reference purposes only and shall not limit the definition of Bondholder Collateral herein.  Notwithstanding anything else in this Agreement, the parties hereto acknowledge and agree that any lien or security interest or other right held by the Agent shall be strictly limited to the Bondholder Collateral and shall not exceed the extent set forth in the Subordinated Security Agreement and Mortgage described in Section 5.

4.     The Agent acknowledges that Debtors, the Trustee, for the benefit of the 2007 Bondholders, and the Lender, have entered into that certain Senior Lien Intercreditor Agreement dated _____, 2008 (the "Senior Intercreditor Agreement").  Nothing contained in this Agreement shall be deemed to affect the Senior Intercreditor Agreement or otherwise alter any of the rights, duties, priorities and/or obligations of the parties thereto.

5.     The Confirmation Order further provides that Debtors and the Agent will enter into a Promissory Note and Subordinated Security Agreement and Mortgage, each for the benefit of the Allowed Class 6 and 7 Claims (the "Class 6 and 7 Agreements").

6.     Agent agrees that, notwithstanding the priorities that might otherwise result under the Uniform Commercial Code or otherwise under law, and irrespective of the validity, time, manner or order of attachment or perfection of any security interests, liens, rights or claims, or the time, manner or order of filing of any document or of any financing statement, Lender and Trustee each shall have prior liens on and security interests in and to the Working Capital Collateral, subject to the terms of the Senior Intercreditor Agreement, until the Bond Debt and the Working Capital Debt are indefeasibly[2] paid in full. It is understood and agreed that any security interest in or replacement liens on any of Debtors' assets granted to Lender or to the Trustee for the benefit of the 2007 Bondholders during any Proceeding[3] shall be subject to and have the benefit of the terms of this paragraph 6.

---

[2] For purposes of this Agreement, "indefeasibly paid in full" means payment in full and in cash, and not subject to any recovery, preference or other disgorgement, giveback or reduction.

[3] For purposes of this Agreement, "Proceeding" means (i) any voluntary or involuntary insolvency, bankruptcy, receivership, liquidation, reorganization, readjustment, composition or other similar case or proceeding relating to either or both Debtors or any of their property, (ii) any case or proceeding for any liquidation, dissolution or other wind-up of either Debtor, whether voluntary or involuntary, and whether or not involving insolvency or bankruptcy proceedings, or (iii) any assignment for the benefit of creditors or marshalling of assets of either Debtors or the appointment of a trustee, receiver, sequestrator or other custodian for Debtors or any of their property.

Approved by Judge Gloria M. Burns January  24, 2008

7.      Lender and Trustee acknowledge that the Agent has been granted a lien on and security interest in the Working Capital Collateral for the benefit of the holders of Allowed Class 6 and 7 Claims pursuant to the terms of the Class 6 and 7 Agreements and the Confirmation Order.  Agent hereby agrees that Agent's lien on and security interest in the Working Capital Collateral, whether now existing or hereafter acquired, is subject and will continue to be subordinate to the rights, liens and security interests of the Lender and the Trustee in the Working Capital Collateral, and the rights, liens and security interests of Lender and the Trustee in the Working Capital Collateral, whether now existing or hereafter acquired, are prior and superior to that of Agent.

8.      Agent further agrees that, notwithstanding the priorities that might otherwise result under the Uniform Commercial Code or otherwise under law, and irrespective of the validity, time, manner or order of attachment or perfection of any security interests, liens, rights or claims, or the time, manner or order of filing of any document or of any financing statement, the Trustee, for the benefit of the 2007 Bondholders and pursuant to the 2007 Bond Documents, at all times, has a first and prior security interest in, lien, and right of payment from the Bondholder Collateral.  The previous sentence in no manner abridges any right, title or interest other than a security interest which the Trustee may have in or to any right or asset identified on Schedule 3 as being part of the Bondholder Collateral.   Agent further agrees that it has no right or authority to make claims against or direct the Authority or the Trustee with respect to any amounts, monies or funds held by the Trustee at any time in the various funds and accounts established pursuant to the Indenture, except as provided in paragraph 10, and that any such claims shall be made solely by the Agent and not by an individual holder of Allowed Class 6 and 7 Claims.

9.      Trustee acknowledges that the Agent also has been granted a lien on and security interest in the Bondholder Collateral to the extent set forth in the Subordinated Security Agreement and Mortgage for the benefit of the holders of Allowed Class 6 and 7 Claims pursuant to the Class 6 and 7 Agreements and the Confirmation Order.  Agent acknowledges and agrees that Agent's rights to, lien on and security interest in such Bondholder Collateral, whether now existing or hereafter acquired, are subject and will continue to be subordinate to the liens, rights of payment, and security interests of the Trustee in the Bondholder Collateral or payment therefrom, and the rights, liens and security interests of the Trustee in the Bondholder Collateral, whether now existing or hereafter arising, are prior and superior to that of Agent and of each holder of Allowed Class 6 and 7 Claims.

10.      Under the Plan as modified by the Confirmation Order, distributions to holders of Allowed Class 6 and 7 Claims will be made solely from funds that become available under Step (e) and Step (j) of the Funds Flow ("Funds Flow") set forth at paragraph 24 of the Confirmation Order.  Solely pursuant to certified direction from Debtors, the Trustee agrees to (i) make a deposit on a monthly basis to an account [to be established under the Indenture] entitled the "Class 6 and 7 Claims Account" (the "Class 6 and 7 Claims Account"), representing the payment, if any, that Debtors certify to the Trustee is required under the Plan to be made on account of the Allowed Class 6 and 7 Claims under Step (e) of the Funds Flow for that month, and (ii) make a deposit on a monthly basis to the Class 6 and 7 Claims Account representing the payment, if any, that Debtors certify to the Trustee is required under the Plan to be made on account of the Allowed Class 6 and 7 Claims under Step (j) of the Funds Flow

*Approved by Judge Gloria M. Burns January  24, 2008*

for that quarter.  The Trustee shall turn over any amounts held in the Class 6 and 7 Claims Account within ten (10) business days of receipt of a certified demand for such funds from the Plan Administrator.  The Trustee may not be held liable to the Agent, any holders of Allowed Class 6 and 7 Claims, Debtors, the Plan Administrator (as defined in the Plan and the Confirmation Order), or any other person with respect to the funds it holds in the Class 6 and 7 Claims Account and/or turns over to the Plan Administrator pursuant to this subparagraph, except for gross negligence or willful misconduct, and in all respects shall be entitled to rely upon the certification provided to it by the Debtors with regard to deposits to the Class 6 and 7 Claims Account and by the Plan Administrator in turning over funds from the Class 6 and 7 Claims Account.  Distribution to Allowed Class 6 and 7 Claims shall be made by the Plan Administrator only.  Trustee and Lender agree and acknowledge that the Trustee holds such funds for the benefit of the holders of Allowed Class 6 and 7 Claims pursuant to the terms hereof, and that the security interests of the Trustee and Lender do not attach to the funds held in the Class 6 and 7 Claims Account, unless the Lender or the Trustee determine on or prior to the date of distribution that the amount deposited in the Class 6 and 7 Claims Account was for any reason erroneously determined and so notify the Agent, in which case such erroneously deposited funds will be reapplied in accordance with the Funds Flow.

11.    This Agreement is effective notwithstanding the time, order or method of attachment or perfection or filing by the Lender, the Trustee or the Agent with respect to the Working Capital Collateral or the Bondholder Collateral, the time or order of recording or the filing or non-filing of financing statements or other recordings or filings.

12.    Agent agrees that it may not take any steps to enforce any rights or remedy any default under any of the Class 6 and 7 Agreements, the Plan or the Confirmation Order by foreclosing upon, or otherwise seeking to encumber, attach, obtain judgment against or any injunction with respect to, any of the Working Capital Collateral or the other Bondholder Collateral until all of the Working Capital Debt and the Bond Debt have been indefeasibly paid in full.

13.    No individual holder of an Allowed Class 6 and 7 Claim shall have any right or authority to enforce any remedy for a default under any of the Class 6 and 7 Agreements, the Plan or the Confirmation Order, by foreclosing upon or otherwise seeking to encumber, attach, obtain a judgment or an injunction with respect to any of the Working Capital Collateral or the other Bondholder Collateral until all of the Working Capital Debt and the Bond Debt have been indefeasibly paid in full.  Notwithstanding the foregoing, any individual holder of an Allowed Class 6 and 7 Claim shall be entitled to enforce any remedy for a default under the Plan or Confirmation Order with respect to (a) any claims or interests of  such holder under the Plan or Confirmation Order other than as a holder of an Allowed Class 6 or 7 Claim, and (b) any claims, causes of action, or other rights or remedies that first accrue after the Effective Date (as that term is defined in the Plan) of the Plan.

14.    This Agreement does not prevent or prohibit the Agent or any individual holder of an Allowed Class 6 or 7 Claim from commencing an action or Proceeding, in the Bankruptcy Court (by motion or otherwise) or in any other court of competent jurisdiction, to enforce Debtors' obligations under the Plan and/or the Confirmation Order against Debtors in the event that Debtors fail to comply with their obligations under the Plan and/or the Confirmation

*Approved by Judge Gloria M. Burns January  24, 2008*

Order.  This Agreement also does not prevent or prohibit the Agent or any individual holder of an Allowed Class 6 or Class 7 Claim from commencing an action against any entity who received payment that should have been made to holders of Allowed Class 6 or 7 Claims pursuant to the Funds Flow.  NOTWITHSTANDING THE FOREGOING, IF THE TRUSTEE HAS ACTED IN ACCORDANCE WITH THE CERTIFIED DEMAND AND/OR CERTIFIED DIRECTION OF THE DEBTORS AND/OR THE PLAN ADMINISTRATOR, THEN, WITH REGARD TO ANY ACTIONS OR PAYMENTS CONTEMPLATED BY THIS PARAGRAPH 14, NO SUCH ACTION MAY BE BROUGHT AGAINST THE TRUSTEE AND THE TRUSTEE SHALL HAVE NO LIABILITY THEREFOR.  LENDER AND TRUSTEE AGREE AND ACKNOWLEDGE THAT ANY AMOUNTS RECOVERED BY THE AGENT OR BY ANY INDIVIDUAL HOLDER OF AN ALLOWED CLASS 6 OR 7 CLAIM, OR ON BEHALF OF ANY OF THE FOREGOING, AS DESCRIBED IN THIS PARAGRAPH 14 WILL BE THE PROPERTY OF THE HOLDER(S) OF ALLOWED CLASS 6 AND 7 CLAIMS.

15.    Agent agrees that it will not make any assertion or claim in any action, suit or proceeding of any nature whatsoever, including a Proceeding, in any way seeking to avoid or otherwise challenging (a) the enforceability of the MFL Loan Agreement and the Working Capital Debt, (b) the priority, validity or effectiveness of the liens and security interests granted to Lender under and in connection with the MFL Loan Agreement, (c) the validity or effectiveness to the transactions contemplated by the MFL Loan Agreement, or (d) any action taken by Lender to enforce its remedies under the MFL Loan Agreement, provided that such action by the Lender does not violate the terms of the MFL Loan Agreement, the Plan, the Confirmation Order or this Agreement.

16.    Agent agrees that it will not make any assertion or claim in any action, suit or proceeding of any nature whatsoever, including a Proceeding, in any way seeking to avoid or otherwise challenging (a) the enforceability of the 2007 Bond Documents and the Bond Debt, (b) the priority, validity or effectiveness of the liens and security interests granted to the Trustee under and in connection with the 2007 Bond Documents, (c) the validity or effectiveness to the transactions contemplated by the 2007 Bond Documents, or (d) any action taken by the Trustee to enforce its remedies under the 2007 Bond Documents, provided that such action by the Trustee does not violate the terms of the 2007 Bond Documents, the Plan, the Confirmation Order or this Agreement.

17.    If either the Lender or the Trustee is required in any Proceeding or otherwise to turn over or otherwise pay to the estate of either Debtor any amount (a "Recovery"), then the Working Capital Debt or the Bond Debt, as the case may be, shall be reinstated to the extent of such Recovery.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto.

18.    Lender may at any time and from time to time, without the consent of or notice to the Agent, without incurring responsibility to the Agent and without impairing or releasing any of Lender's rights, or any of the obligations of the Agent hereunder:

Page 5

*Approved by Judge Gloria M. Burns January 24, 2008*

(a)    Change the amount, manner, place or terms of payment or change or extend the time of payment of or renew or alter the Working Capital Debt, or any part thereof, or amend, supplement or replace the MFL Loan Agreement and/or any other agreements, instruments or documents executed and/or delivered in connection therewith in any manner or enter into or amend, supplement or replace in any manner any other agreement relating to the Working Capital Debt including without limitation, such changes or modifications that may be made in conjunction with a complete or partial refinance thereof or otherwise;

(b)    Release anyone liable in any manner for the payment or collection of the Working Capital Debt;

(c)    Exercise or refrain from exercising any rights against Operating; and

(d)    Apply sums paid by any party to the Working Capital Debt in any order or manner as determined by Lender,

provided, however, that (i) the Lender may not take any action pursuant to subparagraphs 18(a) through (d) if any such action would reduce in any fashion the amounts that otherwise would have been payable to the holders of Allowed Class 6 and 7 Claims under the Funds Flow; and (ii) in no event shall the total amount of Working Capital Debt exceed $1,300,000.00 in principal plus ordinary interest. Nothing in this paragraph may be deemed to change Debtors' obligations under the Plan and Confirmation Order. In addition, nothing in this paragraph 18 shall prevent the Lender from enforcing the MFL Loan Agreement or from exercising its rights and remedies in the event of a default thereunder.

19.    Trustee may at any time and from time to time, without the consent of or notice to the Agent or Lender, without incurring responsibility to the Lender or Agent and without impairing or releasing any of Trustee's rights, or any of the obligations of the Lender or Agent hereunder,

(a)    Change the amount, manner, place or terms of payment or change or extend the time of payment of or renew or alter the Bond Debt, or any part thereof, or amend, supplement or replace the 2007 Bond Documents and/or any other agreements, instruments or documents executed and/or delivered in connection therewith in any manner or enter into or amend, supplement or replace in any manner any other agreement relating to the Bond Debt including without limitation, such changes or modifications that may be made in conjunction with a complete or partial refinance thereof or otherwise;

(b)    Release anyone liable in any manner for the payment or collection of the Bond Debt;

(c)    Exercise or refrain from exercising any rights against Debtors; and

(d)    Apply sums paid by any party to the Bond Debt in any order or manner as determined by the Trustee.

provided, however, that (i) the Trustee may not take any actions pursuant to subparagraphs 19(a) through (d) if any such action would reduce in any fashion the amounts that otherwise would

*Approved by Judge Gloria M. Burns January  24, 2008*

have been payable to holders of Allowed Class 6 and 7 Claims under the Funds Flow; and (ii) in no event shall the total principal amount of the 2007 Bonds be more than $3,312,000. Nothing in this paragraph may be deemed to change Debtors' obligations under the Plan and Confirmation Order. In addition, nothing in this paragraph 19 shall prevent the Trustee from enforcing the 2007 Bond Documents or from exercising its rights and remedies in the event of a default thereunder.

20.    This is a continuing agreement and will remain in full force and effect until (i) all of the Working Capital Debt has been indefeasibly paid in full and Lender has no further obligation to make Loans under the MFL Loan Agreement; and (ii) all of the Bond Debt has been indefeasibly paid in full.

21.    Each of Agent, Lender and Trustee acknowledges, admits and agrees that none of these parties stands in a fiduciary relationship to the other pursuant to or as a result of this Agreement, and none of them will assert any such claim against any of the others arising out of this Agreement.

22.    While the Working Capital Debt or the Bond Debt remain outstanding, Debtors shall provide notice of, but are not required to obtain the Agent's consent to, the sale or disposition of all or any portion of the Working Capital Collateral or the other Bondholder Collateral outside the ordinary course of business, as long as the particular Collateral is sold or disposed of in accordance with the Senior Intercreditor Agreement, the MFL Loan Agreement, the 2007 Bond Documents and/or this Agreement, as appropriate (each an "Authorized Sale"). Agent is hereby deemed to consent to any Authorized Sale, and if the Lender and/or the Trustee release their liens on any Working Capital Collateral or other Bondholder Collateral disposed of in an Authorized Sale, the Agent likewise releases its lien on such Collateral. The Agent will execute and deliver such instruments as Lender or the Trustee reasonably may request in order to accomplish the foregoing.

23.    Unless and until the Bond Debt is indefeasibly paid in full, the Trustee, for the benefit of the 2007 Bondholders, shall have the sole and exclusive right, to be exercised in good faith and subject to Debtors' rights under the 2007 Bond Documents, to adjust settlement for any insurance policy covering the Bondholder Collateral in the event of any loss thereunder. Unless and until the Bond Debt is paid in full and subject only to the Debtors' rights under the 2007 Bond Documents, all proceeds of any such policy and any such award shall be paid to the Trustee for the benefit of the 2007 Bondholders if in respect to the Bondholder Collateral. If the Agent shall, at any time, receive any proceeds of any such insurance policy in contravention of this Agreement, it shall pay such proceeds over to the Trustee. In the event the Trustee allows any portion of such insurance proceeds to be used by Debtors to replace the Bondholder Collateral or for any other purpose, the Agent hereby consents thereto and agrees that it will take all action necessary under the Class 6 and 7 Agreements to permit such use.

24.    Nothing in this Agreement is intended to compel either the Lender or the Trustee at any time to declare the Borrower in default or to compel the Lender or the Trustee to proceed against or refrain from proceeding against any Working Capital Collateral or other Bondholder Collateral in any order or manner. All rights and remedies of the Lender with

*Approved by Judge Gloria M. Burns January  24, 2008*

respect to the Working Capital Collateral or Operating concerning the Working Capital Debt are cumulative and not alternative.  All rights and remedies of the Trustee, with respect to the Working Capital Collateral, the other Bondholder Collateral or Debtors concerning the Bond Debt are cumulative and not alternative.

25.   In the event of the commencement of a Proceeding, the Lender shall have the option (in its sole and absolute discretion) to continue to provide financing to the court-appointed trustee, to another fiduciary, or to Operating as a debtor-in-possession, if the Lender deems such financing to be in its best interests; provided however, that the total principal amount of all loans extended by Lender to Operating and to such court-appointed trustee, other fiduciary or Operating as a debtor-in-possession, whether made pre- or post-Proceeding, and outstanding shall not exceed $1.3 million. The subordination and lien priority provisions of this Agreement shall continue to apply to all advances made while such Proceedings are pending, so that the Lender shall have a prior lien on all Working Capital Collateral, created before or during such Proceeding, to secure all Working Capital Debt, whether created before or during such Proceeding, but such subordination and lien priority provisions shall not apply to any principal amounts exceeding $1.3 million or to unpaid ordinary interest thereon.

26.   Debtors consent to Agent, Lender and the Trustee sharing with each other any information they may have from time to time with respect to Debtors.  Agent, Lender and the Trustee, however, are not obligated to share such information.

27.   All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and will be effective upon receipt.  Such notices and other communications may be hand delivered, sent by facsimile transmission with confirmation of delivery with a copy sent by first class mail, or sent by nationally recognized overnight courier service, to a party's address set forth below or to such other address as any party may give to the other in writing for such purpose:

To the Lender:              Millhouse Funding, LLC
                            c/o Seniors Healthcare, Inc.
                            1114 Wynnewood Avenue
                            Cherry Hill, New Jersey  08002-3256
                            Attn:  Lenard Brown
                            Facsimile No.:  (856) 665-5708

With a copy to:             Archer & Greiner, PC
                            One Centennial Square
                            Haddonfield , NJ 08033
                            Attn:   John Fiorella, Esquire
                            Facsimile No.: (856) 795-0574

*Approved by Judge Gloria M. Burns January  24, 2008*

To the Trustee:              U.S. Bank Corporate Trust Services
                             2 Liberty Place
                             50 South 16th Street, Suite 2000
                             Philadelphia, PA 19102
                             Attn:   Con Hromych
                             Facsimile No.:   (215) 761-9412

With a copy to:              Greenberg Traurig, P.A.
                             450 South Orange Ave., Suite 650
                             Orlando, FL 32801
                             Attn:   Warren Bloom, Esq.
                             Facsimile No.:   (407) 420-5909

*Approved by Judge Gloria M. Burns January  24, 2008*

| To Debtors: | Trenton Convalescent Center Operating Company, L.P.<br>Trenton Convalescent Center Urban Renewal Associates, L.P.<br>c/o Seniors Healthcare, Inc.<br>1114 Wynnewood Avenue<br>Cherry Hill, New Jersey  08002-3256<br>Attn:  Lenard Brown<br>Facsimile No.:  (856) 665-5708 |
| --- | --- |
| With a copy to: | Cozen O'Connor<br>1900 Market Street<br>Philadelphia, PA 19103<br>Attn:  Henry Gladstone, Esquire<br>Facsimile No.:  (215) 665-2013 |
| To Agent: | Healthcare Services Group Inc.<br>c/o Michael Harder<br>3220 Tillman Drive<br>Glenview Corporate Center<br>Suite 300<br>Bensalem, Pennsylvania 19020<br>Facsimile No.:  (215) 639-2152 |
| To Former Counsel of the Committee: | Pepper Hamilton<br>3000 Two Logan Square<br>18th and Arch Streets<br>Philadelphia, PA 19103<br>Attn:  Francis Lawall, Esquire<br>Facsimile No.:  (215) 981-4750 |

28.    This Agreement contains the entire agreement between the parties regarding the subject matter hereof and may be amended, supplemented or modified only by written instrument executed by Agent, Lender and the Trustee.

29.    In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

30.    This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument.   Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart.   Any party so executing this Agreement by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

31.    This Agreement shall be binding upon the parties hereto, and each of the parties' successors, representatives and assigns and neither Debtors nor any other persons or entities

*Approved by Judge Gloria M. Burns January  24, 2008*

whatsoever, including without limitation any other third party donee, investor, incidental beneficiary or any creditor of Debtors, shall have any right, benefit, priority or interest under or because of the existence of this Agreement.  This Agreement shall not be assignable by Lender without ten days prior written notice to the Trustee.  All parties hereto recognize, acknowledge and agree, subject to the notice requirement of the immediately preceding sentence, that Lender may assign its rights and interests in this Agreement to another entity, including in connection with the assignment by Lender to and assumption by such other entity of Lender's position, rights and interests under the MFL Loan Agreement and in the Working Capital Collateral, in which event such entity shall be entitled to all of the benefits of this Agreement, the same as if it were an initial party hereto in place of Lender.

32.    Debtors agree that they will not pay any amount on account of Allowed Class 6 and 7 Claims other than under the Plan and the Confirmation Order.

33.    Debtors and Agent acknowledge that if an Event of Default has occurred under the MFL Loan Agreement, Lender may enter upon the Premises during regular business hours to have access to information regarding the Working Capital Collateral and may remain on the Premises for a commercially reasonable period of time in order to prepare for the disposition of the Collateral or the duplication of books and records relating to the Collateral.  For the purposes of this Agreement, "Premises" means that certain real property located at 325 Jersey Street, Trenton, New Jersey 08611.

34.    This Agreement, and all matters related to or arising out of this Agreement, shall in all respects be interpreted, construed and governed by the substantive laws of the State of New Jersey without regard to principles of conflicts of laws.  Each of the parties (i) submits to the jurisdiction of the Courts of the State of New Jersey or the United States District Court for the District of New Jersey for the purposes of resolving any controversy relating thereto and (ii) waives the right to a jury trial for the purpose of resolving any controversy hereunder or enforcing or defending any rights or claim hereunder or in connection herewith, whether sounding in contract, tort or otherwise.

35.    None of the Agent, the Trustee or the Lender, or any of their respective  officers, directors, employees, attorneys, and representatives, shall incur any liability to any of the Agent, the Trustee, or the Lender, as appropriate, for any act, failure to act, or omission in connection with, or arising out of, this Agreement, the Plan, the Confirmation Order or the Class 6 and 7 Agreements, except for willful misconduct or gross negligence, and, in all respects, the Agent, Trustee and Lender each shall be entitled to rely upon the advice of its counsel with respect to its duties and responsibilities under this Agreement, the Plan, the Confirmation Order and the Class 6 and 7 Agreements.  In no event shall any of the Agent, Trustee or the Lender be liable to any of the Agent, the Trustee or the Lender for damages resulting from causes beyond the reasonable control of the Agent, the Trustee, or the Lender and in no event shall the Agent, the Trustee, or the Lender be liable for incidental, special or consequential damages.

36.    Debtors shall cause this Agreement to be promptly recorded in the real estate records of the County of Mercer, State of New Jersey, and in all offices in which records of the Debtors real property are filed.  Such recordation shall be the obligation of Debtors.

*Approved by Judge Gloria M. Burns January  24, 2008*

[Remainder of Page Intentionally Left Blank]

*Approved by Judge Gloria M. Burns January  24, 2008*

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the date first written above.

**Millhouse Funding, LLC**

**By:     Seniors Healthcare, Inc., its sole member**

By:     _____
        Name: Lenard Brown
        Title:   Senior Vice President


**Trenton Convalescent Center Operating Co., L.P.**

**By:  OZAL, INC., its general partner**

By:     _____
        Name: Lenard Brown
        Title:   Vice President

**Trenton Convalescent Center Urban Renewal Associates, L.P.**

**By:  _____ its general partner**

By:     _____
        Name: Lenard Brown
        Title:   Vice President


**U.S. Bank National Association, in its capacity as Trustee under the Indenture**


By:     _____
Name:   _____
Title:  _____

AGENT

_____

*Approved by Judge Gloria M. Burns January  24, 2008*

**Schedule 1**
**Working Capital Collateral**

**[N.B. – THIS SCHEDULE 1 MAY BE UPDATED PRIOR TO THE EFFECTIVE
DATE, PURSUANT TO THE PLAN AND CONFIRMATION ORDER.]**

    All of Operating's right, title and interest in and to the following property: (a) all accounts, payment intangibles, instruments and other rights to receive payments of Operating (including without limitation, the Accounts), whether now existing or hereafter arising or acquired, (b) all general intangibles (including without limitation, contract rights and intellectual property), chattel paper, documents, supporting obligations, letter of credit rights, commercial tort claims, investment property, rights, remedies, guarantees and collateral evidencing, securing or otherwise relating to or associated with the foregoing, including without limitation all rights of enforcement and collection, (c) all commercial lockboxes, all government lockboxes, all Controlled Accounts and other deposit accounts into which any of the Collections or Advances (each as defined in the Loan Agreement) are deposited, all funds received thereby or deposited therein, and any checks or instruments from time to time representing or evidencing the same, (d) all books and records of Operating evidencing or relating to or associated with any of the foregoing, (e) all information and data compiled or derived by Operating with respect to any of the foregoing (other than any such information and data subject to legal restrictions of patient confidentiality), and (f) all collections, receipts and other proceeds (cash and noncash) derived from any of the foregoing.

"Account" means (a) all accounts, payment intangibles, instruments, chattel paper and all other rights of Operating to receive payments, including without limitation, the third party reimbursable portion of accounts receivable owing to Operating arising out of the delivery by Operating of medical, surgical, diagnostic, treatment or other professional or medical or healthcare related services and/or the supply of goods related to any of such services (whether, such services are supplied by Operating or a third party), including without limitation all healthcare-insurance-receivables and all other rights to reimbursement under any agreements with an Obligor, (b) all accounts, general intangibles, rights, remedies, guarantees, supporting obligations, letter of credit rights, and security interests in respect of the foregoing, and all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under the Loan Agreement in respect of the foregoing, (c) all information and data compiled or derived by such Operating in respect of such accounts (other than any such information and data subject to legal restrictions of patient confidentiality), and (d) all proceeds of any of the foregoing.

*Approved by Judge Gloria M. Burns January  24, 2008*

## Schedule 2
## 2007 Bond Documents

**[N.B. – THIS SCHEDULE 2 MAY BE UPDATED PRIOR TO THE EFFECTIVE DATE, PURSUANT TO THE PLAN AND CONFIRMATION ORDER.]**

1.  Loan and Security Agreement dated as of January ___, 2008 among Trenton Convalescent Center Urban Renewal Associates, L.P., Trenton Convalescent Center Operating Company, L. P. and the New Jersey Economic Development Authority (the "Authority"), including all documents referenced therein and/or attached as exhibits thereto.

2.  Indenture of Trust dated as of _____ between the Authority and U.S. Bank National Association, as Trustee  (the "Trustee"), including all documents referenced therein and/or attached as exhibits thereto.

3.  Series A Note in the amount of $2,565,000, dated as of January ___, 2008, from Trenton Convalescent Center Urban Renewal Associates L.P. and Trenton Convalescent Center Operating Company, L.P. to the Authority, and assigned by the Authority to the Trustee.

    Series B Note in the amount of $747,000, dated as of January ___, 2008, from Trenton Convalescent Center Urban Renewal Associates L.P. and Trenton Convalescent Center Operating Company, L.P. to the Authority, and assigned by the Authority to the Trustee.

4.  Mortgage and Security Agreement dated _____, 2008, from the Debtors to the Authority.

5.  Agreement of Lease dated October 1, 1994 between Trenton Convalescent Center Urban Renewal Associates, L.P. and Trenton Convalescent Center Operating Co., L.P., as amended.

6.  Assignment of Mortgage and Rents and Leases dated _____ from Authority to Trustee.

7.  Assignment of Rents and Leases dated _____ from Trenton Convalescent Center Urban Renewal Associates, L.P. to the Authority.

8.  Assignment of Management Agreement dated _____ from Trenton Convalescent Center Urban Renewal Associates, L.P. to Trenton Convalescent Center Operating Co., L.P.

9.  All Uniform Commercial Code financing statements and amendments thereto filed with regard to the 2007 Bonds.

*Approved by Judge Gloria M. Burns January  24, 2008*

**Schedule 3**
**Bondholder Collateral**

**[N.B. – THIS SCHEDULE 3 MAY BE UPDATED PRIOR TO THE EFFECTIVE DATE, PURSUANT TO THE PLAN AND CONFIRMATION ORDER.]**

*Terms not defined on this Schedule 3 shall have the meanings assigned to such terms in the Loan and Security Agreement and/or Indenture of Trust and/or Mortgage and Assignment of Rents and Leases listed on Schedule 2 and relating to the 2007 Bonds.*

"Bondholder Collateral" includes all real and personal property of the Debtors and the License, including without limitation the property described below.

1.    Working Capital Collateral;

2.    The Mortgaged Property including any and all machinery, apparatus, equipment, fittings, fixtures (including all trade, domestic and ornamental fixtures) and all articles of tangible personal property of every kind and nature used or usable in connection with any present or future operation of and now or hereafter located or installed on, under or in, or attached to, the real property described in the Mortgage and the buildings, structures and improvements now or hereafter located thereon, all additions and accessions thereto, substitutions and replacements therefor;

3.    All general intangibles related to the ownership or operation of the Mortgaged Property or arising therefrom, and all proceeds thereof, including the proceeds of any loans secured by, or made in anticipation of the collection of, any accounts, contract rights or other intangibles;

4.    Any and all proceeds of insurance or condemnation awards payable with respect to any of the Mortgaged Property, and any warranties or service contracts now or hereafter existing with respect thereto;

5.    The Operator's certificate of need and related license to operate the Facility;

6.    The Gross Revenues, which means all receipts, revenues, rentals, income and other moneys received by or on behalf of either Borrower from any source, whether or not in connection with the ownership or the operation of all or any part of the Mortgaged Property, including, without limitation, all operating and nonoperating revenues, and all rights to receive the same whether in the form of Accounts, contract rights, chattel paper, instruments, general intangibles of either Borrower and the proceeds thereof (including the proceeds of any loans secured by, or made in anticipation of the collection of, any such accounts, contract rights or other intangibles), the proceeds of any insurance coverage on and condemnation awards in respect of the Mortgaged Property or any gain on the sale or either Borrower's disposition of property; all of the foregoing, whether now existing or hereafter coming into existence and whether now owned or held or hereafter acquired by either Borrower; and including all gifts, grants, bequests, donations and contributions;

*Approved by Judge Gloria M. Burns January  24, 2008*

7.      The Day Care Lease and all amounts payable by the lessee thereunder; and

8.      Proceeds of any of the foregoing.

*Approved by Judge Gloria M. Burns January  24, 2008*